United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 23, 2005**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

————————————————

No. 04-30370

————————————————

KEYTRADE USA, INC.,

Plaintiff - Appellee,

versus

AIN TEMOUCHENT M/V, in rem; et al.,

Defendants,

SOCIETE NATIONALE DE TRANSPORTS MARITIME & COMPAGNIE NATIONALE
ALBERIENNE DE NAVIGATION MARITIME, in personam,

Defendant - Appellant.

————————————————————————————

Appeal from the United States District Court
For the Eastern District of Louisiana

————————————————————————————

Before JOLLY, DAVIS, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

We must address whether a bill of lading incorporates a voyage charter's arbitration clause.

We hold that it does, and reverse and remand with instructions to compel arbitration.

I.

A misguided and fateful shipment of urea set in motion a series of events that culminated in

this appeal. Societe Nationale de Transports Maritimes & Compagnie Nationale Algerienne de

1

Navigation Maritime ("CNAN") is the owner of the bulk carrier *Ain Temouchent M/V*. On December 4, 2000, CNAN entered into a charter party with Progress Bulk Carriers, Inc. ("Progress Bulk"), providing the *Ain Temouchent* to Progress Bulk for a period of six to ten months at a cost of $6,000 per day.[1] The time charter contained a number of clauses and conditions, among them Clause 48, which states that "[a]ll disputes arising out of this contract . . . shall be referred to arbitration in London."

Progress Bulk was to use the *Ain Temouchent* to transport cargo for other companies. In March, 2001, three months after it entered into the time charter, Progress Bulk agreed to a voyage charter with one such company, Keytrade A.G. ("KAG"). KAG is a Swiss corporation and the parent company of Keytrade USA ("KUSA"), a Chicago-based subsidiary that sells fertilizer to customers in the United States. When KUSA needed to ship cargo, it authorized KAG to negotiate for and obtain on its behalf the necessary transportation. The voyage charter between KAG and Progress Bulk was for the shipment of roughly 22,000 metric tons of prilled urea, to be sent from Shuaiba, Kuwait to New Orleans, Louisiana. Among the many provisions of the voyage charter was Clause 45, pursuant to which "[a]ny dispute arising under this Charter Party [was] to be referred to Arbitration in London." The voyage charter also specified that a "Congen" bill of lading was to be utilized.

Per the Progress Bulk/KAG voyage charter, the urea was loaded onto the *Ain Temouchent*,

---

[1] A charter party is "a specialized form of contract for the hire of an entire ship, specified by name." SCHOENBAUM, THOMAS J., ADMIRALTY AND MARITIME LAW, § 11-1 (4th ed. 2001). There are two types of charter parties that will be referenced regularly in this opinion: voyage charters and time charters. As their names suggest, a time charter provides for the charterer to obtain the vessel for a fixed period of time, and under a voyage charter, the charterer obtains the vessel for the length of a voyage. *Id.*

and KUSA was given a Congen bill of lading acknowledging such, on March 26, 2001. The bill of lading was signed by the master of the *Ain Temouchent* on behalf of CNAN. Among the many features of a Congen bill of lading is an arbitration incorporation clause, which states that "[a]ll terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, *including the Law and Arbitration Clause*, are herewith incorporated." (emphasis added).

Shortly thereafter, the *Ain Temouchent* departed for the scheduled 42-day journey—the shipment was to arrive before the beginning of the farming season, by May 10, 2001—to New Orleans. The trip took longer than planned. Among the delays that befell the *Ain Temouchent* were a seizure of the vessel by a creditor-supplier during a stop for repairs, and an unscheduled crew change. In all, the trip was delayed 16 days—the *Ain Temouchent* ultimately arrived in New Orleans on May 26, 2001.

Before the *Ain Temouchent* had docked in New Orleans, KUSA filed this lawsuit against both Progress Bulk and CNAN *in personam*, and against the *Ain Temouchent in rem*. KUSA alleged breaches of the contract of carriage (the bill of lading) and of defendants' Carriage of Goods at Sea Act obligations, seeking damages it suffered from the drop in market value of prilled urea. Progress Bulk, invoking Clause 45 of its voyage charter with KAG, moved the district court to dismiss the case and to compel arbitration. Because KUSA, and not KAG, filed the suit, the district court denied Progress Bulk's motion unless and until Progress Bulk could produce sufficient evidence to establish an agency relationship between KAG and KUSA.

Progress Bulk ultimately produced that evidence, and reurged its motion to compel arbitration in November, 2002. On this second motion, the district court determined that KUSA and KAG do indeed have an agency relationship—a ruling that is not contested on appeal—and that, under the

3

voyage charter, arbitration was proper between Progress Bulk and KUSA. Also in November, 2002, CNAN moved, for the first time, to compel arbitration on theories of equitable estoppel. The district court denied CNAN's motion pending the conclusion of the KUSA-Progress Bulk arbitration, but the court did not rule on the merits of the motion.

After KUSA settled its dispute with Progress Bulk, CNAN reurged its motion to compel arbitration. In this second motion, CNAN abandoned its equitable estoppel rationale, instead pressing an argument based on *Cargill Ferrous International v. SEA PHOENIX M/V*, 325 F.3d 695 (5th Cir. 2003), a case that had been decided after CNAN's initial motion to compel arbitration. Under *SEA PHOENIX*, a bill of lading may be found to incorporate an arbitration clause of the charter party, even if one of the parties to the bill of lading was a nonsignatory to the charter party. The district court denied the motion on the merits, finding *SEA PHOENIX* factually distinguishable. CNAN timely appeals that ruling.

II.

This Court has jurisdiction pursuant to §§ 4 and 16 of the Federal Arbitration Act, 9 U.S.C. §§ 4, 16(a)(1)(C) (2002), and § 28 U.S.C. 1291. The district court's refusal to compel arbitration is reviewed *de novo*. *See, e.g.*, *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 428–29 (5th Cir. 2004).

III.

We must first consider whether CNAN had a right to compel arbitration with KUSA. After concluding that it did, we address whether CNAN waived that right.

A.

As a general matter, an agreement to arbitrate must be in writing. *See Sedco, Inc. v. Petroleos*

4

*Mexicanos Nat'l Oil Co.*, 767 F.2d 1140, 1144–45 (5th Cir. 1985); *see also* THE CONVENTION ON THE RECOGNITION AND ENFORCEMENT OF FOREIGN ARBITRAL AWARDS, reprinted as Note to 9 U.S.C. § 201. CNAN concedes, as it must, that no such agreement exists between CNAN and KUSA: although the time and voyage charters each include an arbitration clause, neither was between CNAN and KUSA; while the bill of lading was an agreement between KUSA and CNAN, it did not contain an arbitration clause.

Thus, CNAN's only available argument is that the bill of lading incorporated the arbitration clause from a charter party. Generally, "[a] bill of lading can incorporate a charter party if the bill of lading specifically refers to the charter party." *Cargill v. GOLDEN CHARIOT M/V*, 31 F.3d 316, 318 (5th Cir. 1994). Here, the bill of lading included an incorporation clause, but it did not specify the charter party that it sought to incorporate, leaving both the name and date blanks empty. Recently, this Court in *SEA PHOENIX* provided the analytical framework for situations where the charter party is not explicitly identified. 325 F.3d at 698–99. In *SEA PHOENIX*, we held that, where, as here, an incorporation clause is present in the bill of lading, the correct test is whether "the bills of lading are in the hands of the charterer, and [] there is no confusion concerning who was the charterer or which charter party the bills of lading sought to incorporate." *Id.* (citing *State Trading Corp. of India v. Grunstad Shipping*, 582 F. Supp. 1523, 1524 (S.D.N.Y. 1984)).

As an initial matter, we address, and reject, KUSA's argument that the bill of lading was not in the hands of the charter party. In *SEA PHOENIX*, the holder of the bill of lading was also a party to the voyage charter. 325 F.3d at 697–98. Because KAG was a party to the voyage charter, but KUSA was listed on the bill of lading, KUSA argues that the bill of lading did not "remain in the hands of the charterer" as required under *SEA PHOENIX*. It is true that two different entities were

5

parties to the bill of lading and the voyage charter. Due to the district court's finding concerning the KUSA/KAG agency relationship, however, KUSA's argument presents a distinction without a difference. KAG was empowered, among other things, to seek out and procure transport for KUSA's goods. As the district court found, KUSA does not charter its own vessels, rather, it relies on KAG to negotiate transportation. In short, because the district court found that KAG and KUSA were legally intertwined entities—a decision that KUSA does not now appeal—the fact that KUSA, and not KAG, held onto the bill of lading has no legal import.

Therefore, the precise question we are left with is whether there is "no confusion" from the bill of lading as to which charter party governed the rights of the parties. In order to answer this question, it is helpful to look at the parallel facts of *SEA PHOENIX*. In *SEA PHOENIX*, Serene was the owner of the vessel, the *M/V Sea Phoenix*, which it time chartered to Western. Western, in turn, entered into a voyage charter with Cargill to use the *Sea Phoenix* to transport a shipment of steel coils. *Id.* at 698. The only contract between Serene and Cargill was the bill of lading, which Serene transferred to Cargill when the shipment of coils was loaded. *Id.* The voyage charter included an arbitration clause, but the bill of lading did not. The bill of lading did contain the following incorporation clause, identical to the one in this case: "All terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, including the Law and Arbitration Clauses, are herewith incorporated." *Id.*

The Court found that there was no confusion as to the charter party it sought to incorporate. As the Court stated:

> First, Cargill received and continued to hold bills of lading issued pursuant to the Cargill-Western Bulk voyage charter. Second, the agent who signed the bills of lading . . . received its agency authority solely from a term in the voyage chart er. Third, the bills of lading indicate freight is to be paid pursuant to the charter party. This provision depends on the

incorporation of the Cargill-Western Bulk voyage charter to retain any meaning. Fourth, the Cargill-Western Bulk voyage charter, the *only charter party that Cargill signed*, requires all bills of lading issued under the voyage charter to incorporate, among other things, the voyage charter's arbitration clause.

*Id.* at 699 (internal citations omitted) (emphasis added). There is a similar factual basis here. It is the voyage charter that specifies a Congen bill of lading was to be used. *See* Clause 9. It is the voyage charter that describes how the bill of lading should be marked vis-a-vis freight. *See* Clause 18 (mandating markings of "CLEAN 'ON BOARD'/ FREIGHT PAYABLE AS PER CHARTER PARTY"). It is the voyage charter that grants the captain of the *Ain Temouchent* the authority to sign the bill of lading. *See* Clause 9. Indeed, there is nothing in the CNAN/Progress Bulk time charter that speaks of the bill of lading. With only one (of two) charter parties speaking to shipment and the bill of lading, it is difficult to discern how there could be "confusion" as to which charter party the bill of lading's incorporation clause referred.

KUSA offers nothing to rebut these facts. Instead, KUSA focuses primarily on the fourth factor from Cargill—*i.e.*, that the voyage charter does not include provisions requiring incorporation of the arbitration clause into the bills of lading. Parroting the district court, KUSA contends that the Progress Bulk/KAG voyage charter does not require the incorporation of an arbitration provision into any bills of lading issued under that charter party. For example, Clauses 44 and 45 discuss incorporation and arbitration, respectively, but neither discusses incorporation *of* arbitration into the bills of lading issued under the voyage charter. Therefore, KUSA concludes that "there *is* confusion concerning who in fact was the charterer or which charter party the bills of lading sought to incorporate."

Only if this Court were to look solely at the voyage charter, and ignore the language of the

bill of lading, could this interpretation be valid.[2]  Such a narrow inquiry, however, is not justified

under *SEA PHOENIX* and its predecessors.   Analyzing the substance of the bill of lading is a

fundamental component of our analysis; as noted above, this Court has held that if a bill of lading

specifically refers to the charter party, then the charter party is deemed incorporated (to the extent

referenced in the bill of lading).  *GOLDEN CHARIOT,* 31 F.3d at 318.  The underlying concern for

the "no confusion" requirement is that a third party, which did not participate in the formation of, or

is otherwise unaware of, the charter party, should not be held to terms of which it had no notice.  *SEA*

*PHOENIX*, 325 F.3d at 698 (quoting *Cargill B.V. v. S/S OCEAN TRAVELLER*, 726 F. Supp. 56,

59 (S.D.N.Y. 1989)); *see also Associated Metals & Minerals Corp. v. M/V Venture*, 554 F. Supp.

281, 283 (D.C. La. 1983) ("[T]hird parties, since they are strangers to the charter party, should be

able to rely on clean bills of lading free from the restraint of agreements between the shipowner and

charterer, as to which the third parties have no notice.").  The original charter party, by itself, is poor

evidence of whether a third-party was aware of the charter party's terms, as many third-parties will

be aware of the charter party only *after* the charter party's formation, if at all.  *SEA PHOENIX*, with

its factual discussion resting in large part on the bill of lading, is an example of this bill-centric inquiry.

325 F.3d at 698; *see also id.* at 698–99 (noting that there is incorporation when there is "no

_____

[2] Even if our holding were to rest entirely on whether the voyage charter authorized incorporation, the issue is not nearly as clear as KUSA contends.  For example, the voyage charter explicitly mandates the use of a Congen bill of lading, a form which includes the incorporation language.  *See* Clause 9.  Given the negotiations that are evident from the face of the voyage charter—numerous pre-printed clauses are edited or deleted, and other supplemental clauses are added—Clause 9 is not mere boilerplate.  Because these are sophisticated parties, if we were to look solely at the intention of the parties from the voyage charter, we would be apt to conclude that they intended the incorporation.  *Steel Warehouse Co. v. Abalone Shipping Ltd. of Nicosai*, 141 F.3d 234, 237 (5th Cir. 1998) (noting that the Congen bill of lading is a "common, internationally recognized" instrument).

confusion concerning . . . which charter party *the bill of lading sought to incorporate*") (emphasis added). There are situati ons, present in *SEA PHOENIX*, *State Trade*, as well as here, where the examination of the charter party is relevant and necessary. Nevertheless, in such situations, it must be compared with the terms of the bill of lading and cannot rest solely on the charter's terms.

Thus, whether the voyage charter provides that all bills of lading should incorporate arbitration provisions—the thrust of both KUSA's and the district court's analyses—may be relevant, but it is typically not dispositive.[3] As shown above, it is clear that the March 26, 2001 bill of lading refers back to the Progress Bulk/KAG voyage charter. While that determination would be buttressed if the voyage charter included provisions regarding the incorporation of arbitration, *see State Trading*, 582 F. Supp. at 1524, the lack of such clauses does not change our fundamental conclusion.

Finally, KUSA argues that *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347 (5th Cir. 2003), changes the *SEA PHOENIX* calculus. Although KUSA superficially stresses *Bridas*'s importance, it provides little substantive analysis as to the case's impact. In fact, *Bridas* neither mentions *SEA PHOENIX*, nor deals with bills of lading or other contracts of carriage—indeed, it is not a maritime case at all. *Bridas* does discuss arbitration agreements, and as far as we can discern, the following portion of KUSA's brief captures the essence of its *Bridas* argument: "'[Under *Bridas*,] who is actually bound by an arbitration agreement . . . [is] expressed in the terms of the agreement,' and [one] only looks to the four corners of the document in finding the answer." Appellee Brief at 18 (quoting *Bridas*, 345 F.3d at 355). This can hardly be stated as a novel proposition of law, for, as we have noted, a first principle of determining the existence of a right to compel arbitration is to

---

[3] In some circumstances, not applicable here, the parties may explicitly state in the charter party that the bill of lading should be issued "without prejudice to the charter party." SCHOENBAUM, ADMIRALTY AND MARITIME LAW at § 11-6.

look for a written agreement. *See, e.g.*, *Sedco*, 767 F.2d at 1144–45. Moreover, to the extent that KUSA argues that an agreement to arbitrate may *only* be found from the four corners of the document, its faith is misplaced. As the court in *Bridas* wrote, there are exceptions to the four corners rule, one of which is for the inclusion of nonsignatory principals/agents. *Bridas*, 345 F.3d at 356 (noting that, among the "[s]ix theories for binding a nonsignatory to an arbitration agreement [that] have been recognized" is the presence of an agency relationship). Here, the district court, in an unappealed order, found that KAG and KUSA had an agency relationship.

Because there was no confusion as to which charter party the bill of lading sought to incorporate, we hold that the Progress Bulk/KAG voyage charter's arbitration clause established in CNAN a right to compel arbitration with KUSA.

B.

Having determined that the bill of lading provided CNAN a right to compel arbitration, we next turn to the question of whether CNAN has waived that right. *See, e.g.*, *Williams v. Cigna Fin. Advisors, Inc.*, 56 F.3d 656, 661 (5th Cir. 1995) ("'[T]he right to arbitration, like any other contract right, can be waived.'") (quoting *Miller Brewing Co. v. Fort Worth Distrib. Co., Inc.*, 781 F.2d 494, 497 (5th Cir. 1986)).

A party waives its right to arbitration when, among other things, it invokes the judicial machinery to "the detriment or prejudice of the other party." *Republic Ins. Co. v. PAICO Receivables, LLC*, 383 F.3d 341, 344 (5th Cir. 2004). "[T]he party must, at the very least, engage in some overt act in court that evinces a desire to resolve the arbitrable dispute through litigation rather than arbitration." *Id.* (quoting *Subway Equip. Leasing Cor. v. Forte*, 169 F.3d 324, 329 (5th Cir. 1999).

10

Despite the possibility of waiver, "[t]here is a well-settled rule in this circuit that waiver of arbitration is not a favored finding, and there is a presumption against it." *Steel Warehouse Co. v. Abalone Shipping Ltd. of Nicosai*, 141 F.3d 234, 238 (5th Cir. 1998); *see also Miller Brewing*, 781 F.2d at 496–97 ("[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.") (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co.*, 460 U.S. 1, 24 (1983)) (internal quotations omitted). That burden "falls even more heavily" when the party seeking arbitration "has included a demand for arbitration in its answer." *Steel Warehouse*, 141 F.3d at 238 (quoting *Southwest Indus. Import & Export, Inc. v. Wilmod Co.*, 524 F.2d 468, 470 (5th Cir. 1975)). In the Eighth Defense of its answer to KUSA's complaint, CNAN specifically called on the district court to refer the case to arbitration. Consequently, KUSA must overcome a particularly heavy presumption against waiver.

KUSA contends that CNAN "invoked" the judicial machinery for two reasons, neither of which is persuasive.[4] First, KUSA argues that CNAN waived its right because it filed an extensive summary judgment motion—in excess of 100 pages—with little evidence of an indication for arbitration. KUSA offers no legal authority for why a motion for summary judgment, filed from a defensive posture, can be characterized as an invocation of judicial process. Even assuming, *arguendo*, that it is, CNAN concurrently filed a motion to compel arbitration in the alternative to its

---

[4] KUSA does make other, frivolous arguments. For example, KUSA argues that because CNAN's second motion to compel was based entirely on *SEA PHOENIX*, a case that was decided after Progress Bulk's motion for arbitration, it waived its right to arbitration. Even had CNAN, for the first time, asked for arbitration on a newly developed basis some months or years after the initial complaint, that would not speak to waiver. Rather, CNAN would merely be exercising a newly vested right. One need not consider that scenario, however, as it is true both that CNAN (i) included a claim for arbitration in its original answer, and (ii) filed an initial motion to compel arbitration based on theories of equitable estoppel.

motion for summary judgment, removing any doubt as to waiver. Second, KUSA argues that CNAN participated in a number of discovery requests. Although CNAN did comply, sometimes under court order, with KUSA's requests for discovery, a party may participate in the discovery process so long as it does not "shower[] [the opposing party] with interrogatories and discovery requests." *Steel Warehouse*, 141 F.3d at 238. Our review of the record reveals that the only evidence of CNAN's affirmative participation was its submission of a witness list should the case go to trial. This hardly constitutes evidence of waiver.

IV.

The judgment of the district court is REVERSED and REMANDED, with instructions to enter an order granting CNAN's motion to compel arbitration.